RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 23a0050p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

GREEN GENIE, INC.; ALVIN ALOSACHI,

*Plaintiffs-Appellants*,

*v.*

No. 22-1441

CITY OF DETROIT, MICHIGAN; CITY OF DETROIT BOARD OF ZONING APPEALS; CITY OF DETROIT BUILDINGS, SAFETY ENGINEERING AND ENVIRONMENTAL DEPARTMENT,

*Defendants-Appellees*.

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:21-cv-10790—David M. Lawson, District Judge.

Argued:  March 9, 2023

Decided and Filed:  March 21, 2023

Before:  BATCHELDER, GRIFFIN, and READLER, Circuit Judges.

_____

### COUNSEL

**ARGUED:**  Michael F. Wais, HOWARD & HOWARD ATTORNEYS PLLC, Royal Oak, Michigan, for Appellants.  Sheri L. Whyte, CITY OF DETROIT, Detroit, Michigan, for Appellees.  **ON BRIEF:**  Michael F. Wais, Jonathan F. Karmo, HOWARD & HOWARD ATTORNEYS PLLC, Royal Oak, Michigan, for Appellants.

_____

### OPINION

_____

CHAD A. READLER, Circuit Judge.  Following changes to Michigan's marijuana law, Green Genie sought to operate a medical marijuana distribution facility in the City of Detroit.

The City denied Green Genie's request because its proposed facility fell within a "drug-free zone," a term of art defined by the City's code. Green Genie challenged the City's determination through state and local channels. Failing on those fronts, Green Genie filed this suit, alleging that the City violated the Constitution in the course of denying the permit. The district court granted summary judgment to the City, leading to this appeal. In view of the legal flaws in basic elements of each of Green Genie's constitutional claims, we affirm.

## I.

The City of Detroit enjoys a rich history. Over the years, the City's impact has been felt in all sectors, from business (e.g., auto industry) to culture (e.g., Motown) to culinary (e.g, pizza, ginger ale) to sports (e.g., Joe Louis, Tigers), to name a few. More recent days brought new challenges. But today, the City's fortunes have brightened once again. Among other recognitions, the City has been named one of world's greatest places to explore. *See* Sarah Bence, *Detroit: Newfound Glory*, Time (July 12, 2022, 7:10 AM), https://time.com/collection/worlds-greatest-places-2022/6194455/detroit/.

The City's growing business community has aided its resurgence. One of those industries, perhaps more controversial than most, is its bourgeoning medical marijuana industry. Following a 2008 initiative that decriminalized marijuana for medical purposes under state law and a 2016 law affording legal status to medical marijuana dispensaries in Michigan, the industry began taking hold around the Great Lakes State, including in Detroit. *See* Seth Quidachay-Swan, *Researching Marijuana Law*, 100 Mich. Bar J. 52 (2021).

Those who wish to operate a medical marijuana facility in Detroit must satisfy the City's permit process. *See* Detroit, Mich., Code § 50-3-535. (All cites to the Detroit City Code are to the 2023 version of the code unless otherwise specified). The process in place at the time of the events at issue worked as follows. Upon receiving an application to operate such a facility, the City's Buildings, Safety Engineering, and Environmental Department (BSEED) would screen the application to determine whether the applicant complies with "locational specifications" set forth in the City code. *Id.* § 50-3-536(b). To that end, the code imposes several restrictions on where a medical marijuana facility may operate. *Id.* § 50-3-535(b). One prohibits locating a medical

marijuana facility in a drug-free zone, that is, an area "within 1,000 radial feet of the zoning lot" containing any one of a number of sensitive places, including a school. *See id.* §§ 50-3-535(b)(1), 50-16-172. If an application complied with the code's locational requirements, the application "shall transfer" to the City's Medical Marihuana Facility Review Committee. *Id.* § 50-3-536(c) (2018). The Committee, in turn, would make a recommendation back to BSEED regarding a host of discretionary zoning considerations specific to the project at issue. *Id.* §§ 50-3-536(d), 50-3-281. From there, BSEED would review the application for final approval or denial. *Id.* §§ 50-3-536(e); 50-3-203. (Following the events at issue here, the City eliminated the Review Committee, along with the mandate to transfer applications that complied with locational specification requirements to that committee, leaving all review within the discretion of BSEED. *See* Ordinance No. 2021-9; *see also* Detroit, Mich., Code § 50-3-536(c).)

This regulatory framework sets the stage for today's case. Green Genie is a Michigan corporation that owns medical marijuana provisioning centers in the Detroit metro area. In 2018, it applied to run a medical marijuana distribution facility at 16711 Mack Avenue in the City of Detroit. BSEED denied the application at the initial screening stage on the grounds that the proposed facility site was located in a drug-free zone. Relevant to the City's assessment was a tax lot (in the neighboring community of Grosse Point Park) on which St. Clare of Montefalco Catholic School sits. The lot, the City determined, was less than 1,000 radial feet to the west of the site where Green Genie proposed to build its distribution facility.

Green Genie was not the only applicant to run up against the City's proximity restrictions. A handful of other applicants also had their applications denied because their proposed sites were determined to be within 1,000 radial feet of a location—including a tax lot for a school—subject to the City's drug-free zone definition. Two other applicants, however, fared better.

One is Detroit Roots. It applied to establish a medical marijuana provisioning facility at 12604 East Jefferson in Detroit. Measuring from that address to the nearest tax lot containing a school building, the City determined that the proposed facility was over 1,000 radial feet from the parcel and thus sent the application along for eventual approval. A year later, however, a tax parcel containing Detroit Roots was combined with two other tax parcels into one new tax

parcel, resulting in Detroit Roots being less than 1,000 feet from the closest edge of the school. Nonetheless, the City seemingly has not revoked Detroit Roots's permit.

The other is Mack Wellness. Mack Wellness applied for a permit to run a medical marijuana facility at 16001 Mack, in Detroit, a location west of St. Clare of Montefalco (the school that was the basis for Green Genie's application denial). The City, calculating from what it believed was the closest part of St. Clare of Montefalco's tax parcel to the proposed site, determined that Mack Wellness's proposed site was more than 1,000 feet from the parcel. That computation, however, overlooked a patch of grass within 1,000 feet of the proposed site that the City mistakenly assumed was owned by Grosse Pointe Park. In truth, the land was used by St. Clare of Montefalco students. The City did not learn of this error until this litigation, and the City approved the application (and has never revoked Mack Wellness's permit).

Green Genie challenged the City's determination through state administrative and judicial channels. *See Green Genie, Inc. v. City of Detroit*, 599 F. Supp. 3d 544, 548–49 (E.D. Mich. 2022). In those proceedings, the parties debated what constituted a "zoning lot" under the City code. *Id.* at 548–50. The City deemed the St. Clare of Montefalco's "zoning lot" to include land where the parish church of the same name sits (even though the church and school have separate lots of record), all of which is listed under a single tax parcel number. *Id.* Green Genie, on the other hand, took the view that a "zoning lot" includes only the specific lot of record upon which the school sits, divorcing the parish church from its school. *See Alosachi v. City of Detroit*, No. 356583, 2022 WL 1194634, at *2 (Mich. Ct. App. Apr. 21, 2022) (per curiam) (discussing the dispute). The City prevailed. *Id.* at *3–4.

Green Genie (along with its owner Alvin Alosachi) filed a complaint in federal court against the City, its Board of Zoning Appeals, and BSEED. (For simplicity, we refer to plaintiffs as Green Genie and defendants as the City). The thrust of Green Genie's complaint was that the City erred in measuring the distance between the proposed Green Genie site and St. Clare of Montefalco's, yet approved the Detroit Roots and Mack Wellness sites. Those practices, Green Genie alleged, violated the Fourteenth Amendment's equal protection and due process guarantees. Following discovery, the City moved for summary judgment, which the district court granted and then accordingly entered judgment for the City.

## II.

On appeal, Green Genie takes issue with the district court's dismissal of its procedural and substantive due process claims as well as an equal protection claim. We review the district court's summary judgment award de novo. *See Wiley v. City of Columbus*, 36 F.4th 661, 667 (6th Cir. 2022). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once that showing has been made, the nonmoving party must present "significant probative evidence" revealing that there is "more than some metaphysical doubt as to the material facts" necessitating a trial; if the nonmovant cannot do that, dismissal is warranted. *See Wiley*, 36 F.4th at 667 (citations and quotations omitted). With these standards in mind, we turn first to the due process claims.

## A.

The Fourteenth Amendment's Due Process Clause prohibits governmental deprivations of "life, liberty, or property, without due process of law." *See* U.S. CONST. amend. XIV, § 1. The Clause has been construed to include not only a procedural component, but also (although not obvious from its text) a substantive one. That latter right hazily protects against "certain government actions regardless of the fairness of the procedures used to implement them." *See Daniels v. Williams*, 474 U.S. 327, 331 (1986). No matter the nature of the due-process theory asserted, Green Genie must show a deprivation of a constitutionally protected right—in this case, a deprivation of property. *See Prater v. City of Burnside*, 289 F.3d 417, 431 (6th Cir. 2002).

How is "property" defined, for Due Process Clause purposes? Narrowly, in some respects. It "does not protect everything that might be described as a 'benefit.'" *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (citation omitted). Rather, one must have a "legitimate claim of entitlement to" the purported property interest, as opposed to an abstract need or desire. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Applying this understanding to the setting before us, a government benefit, such as a permit, is not a protected entitlement if officials "may grant or deny it in their discretion." *Town of Castle Rock*, 545 U.S. at 756.

That rule helps shape Green Genie's claim.  All appear to agree that permit approval is a decision left to the City's discretion, meaning obtaining a permit is not a protected entitlement.  Instead, Green Genie contends that it had a "protected property interest" in having its application transferred to the Review Committee as a matter of course.  The heart of Green Genie's argument, it seems, is that the City code's former use of mandatory language—"shall"—entitles applicants that otherwise complied with locational specifications to consideration by that special committee.

That contention too runs headlong into unfavorable precedent.  As we have said before, a plaintiff may not "assert a property right in government procedures themselves."  *Janosek v. City of Cleveland*, 718 F.3d 578, 582 (6th Cir. 2013); *see also Richardson v. Twp. of Brady*, 218 F.3d 508, 517–19 (6th Cir. 2000) (same); *LRL Props. v. Portage Metro Hous. Auth.*, 55 F.3d 1097, 1110 (6th Cir. 1995) (same).  At bottom, Green Genie's request to be heard by a special committee is little more than an interest in "a procedure itself, without more."  *United of Omaha Life Ins. Co. v. Solomon*, 960 F.2d 31, 34 (6th Cir. 1992) (citation omitted).  In response, Green Genie emphasizes the decision in *Ritz v. City of Findlay*, No. 3:07-CV-3716, 2009 WL 1954635 (N.D. Ohio July 6, 2009).  That the distributor's lead authority is an unpublished, district court case suggests the case law is not in its favor.  Nor, in any event, is *Ritz* analogous.  Instead, that case concerned a property interest in obtaining ultimate approval of a site plan proposal for an apartment complex.  *Id.* at *6.  It has nothing to do with an interest in the procedures at issue themselves.  With no property interest at stake, there is no need to entertain Green Genie's remaining arguments about the inadequacy of the City's procedures or that the City more generally engaged in an arbitrary and irrational decision making.  *See Prater*, 289 F.3d at 431–32.

**B.**

That leaves Green Genie's equal protection claim.  The Fourteenth Amendment's guarantee of the "equal protection of the laws" bars governmental discrimination that either (1) burdens a fundamental right, (2) targets a suspect class, or (3) intentionally treats one differently from others similarly situated without any rational basis for the difference.  *TriHealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 788 (6th Cir. 2005).  Green Genie hitches its claim to the

third wagon, framing its argument as a class-of-one claim.  *See Davis v. Prison Health Servs.*, 679 F.3d 433, 441 (6th Cir. 2012).  To prevail on that claim, Green Genie must show that (1) the City "intentionally treated" Green Genie "differently from others similarly situated" and (2) "there is no rational basis for the difference in treatment."  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam).

We can begin and end with *Olech's* first prong.  Does the evidence create a genuine dispute as to whether the City, in denying Green Genie's application, "intentionally treated" Green Genie "differently from others similarly situated"?  *Id.*  To our eye, no.  Begin with a bedrock background principle of equal protection law:  the "unequal application" of a facially neutral law is "not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination."  *Snowden v. Hughes*, 321 U.S. 1, 8 (1944).  Sometimes, a plaintiff can present direct evidence of discrimination.  But the more common approach, as here, is to attempt to demonstrate intentional discrimination through circumstantial evidence.  *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–66 (1977).  For Green Genie's class-of-one claim, it must demonstrate "an inference" of intentional discrimination "arising from the fact" that the adverse treatment of Green Genie "was such a stark outlier from an otherwise consistent pattern of favorable treatment in similarly situated cases."  *See SECSYS, LLC v. Vigil*, 666 F.3d 678, 689 (10th Cir. 2012) (Gorsuch, J.); *see also TriHealth*, 430 F.3d at 788 (requiring proof that the plaintiff was "intentionally singled out by the government for discriminatory adverse treatment").  The notion of "similarly situated individuals" is thus "simply a way" to gauge whether the "plaintiff failed at the first step to prove intentional discrimination."  *See SECSYS*, 666 F.3d at 689.  To make that assessment, we look to "relevant similarity," which is a product of the specific "facts and context of the case."  *Loesel v. City of Frankenmuth*, 692 F.3d 452, 463 (6th Cir. 2012).

Turning to the facts and context here, Green Genie claims it was treated relatively worse by the City than other medical marijuana facility applicants.  In its complaint, Green Genie suggested that the City's approval of Detroit Roots and Mack Wellness—notwithstanding their location in a drug-free zone—meant that the City purposely used a different method of measurement when evaluating Green Genie's application.  Put another way, Green Genie targets

the City's process for determining whether an applicant's proposed medical marijuana facility was in a drug-free zone. For "relevant" comparator purposes, then, we look to other medical marijuana facilities that submitted applications around the time of Green Genie's application. *See United States v. Green*, 654 F.3d 637, 651 (6th Cir. 2011) (analyzing who is "similarly situated" at the appropriate "time frame" of the alleged violation).

At summary judgment, the City submitted evidence that it applied the same test to all applicants. Rather than the applicable test, it was idiosyncrasies in Detroit Roots's and Mack Wellness's requests that resulted in their approval. Detroit Roots obtained City approval because the underlying comparator tax lot had not yet been merged with others to extend the reach of the drug-free zone. And Mack Wellness received approval because officials overlooked a patch of grass owned by a school that would have placed the proposed site within the drug-free zone.

But the relevant comparators do not end there. At summary judgment, the City expanded the universe of comparators: it presented evidence that four other medical marijuana facility applicants were subjected to the same tax-lot-based measurement as was Green Genie. And, like Green Genie, their applications were rejected as being within a drug-free zone. Green Genie, for its part, failed to present evidence to contest the City's method of measurement in those cases.

Even viewing the evidence in a light most favorable to Green Genie, the distributor fails to satisfy the first prong of the *Olech* test. The City applied the same method of measurement to each comparable applicant. Many applications were rejected on that basis. True, Detroit Roots and Mack Wellness fared better. But that was due to an arguably improper application of the test, not the test itself. On balance, Green Genie fails to show that its application was a "stark outlier" from the others. *See SECSYS*, 666 F.3d at 689. Indeed, in many respects, granting Green Genie's wish seemingly would flip a class-of-one claim on its head—it would turn on the fact that two manufacturers were erroneously singled out for *beneficial* treatment. *TriHealth*, 430 F.3d at 788. And, again, any favorable treatment of Detroit Roots and Mack Wellness was due to simple misunderstandings about those particular applications, not an effort to "single[] out" Green Genie. *Id*. The City's arguably "sloppy administration" of its permitting system and "misapplication of . . . local law" is insufficient to show an equal protection violation. *Charles v.*

*Baesler*, 910 F.2d 1349, 1357 (6th Cir. 1990); *see also Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 905 (6th Cir. 2019).

Green Genie has three responses. First, it says that the district court at summary judgment inappropriately weighed the evidence. But the evidence was one-sided, leaving nothing favoring Green Genie. Green Genie chiefly relied on the purported favorable treatment of Detroit Roots and Mack Wellness, which, it says, suggested an inference that the City intended to single out Green Genie. For summary judgment purposes, however, a bare assertion that a plaintiff "was treated one way and everyone else another . . . has never been thought to raise an equal protection claim." *See Charles*, 910 F.2d at 1357 (citation omitted); *see also Copeland v. Machulis*, 57 F.3d 476, 481 (6th Cir. 1995) ("[M]ere disparate impact is insufficient to demonstrate [at summary judgment] an equal protection violation."). In other words, there is simply no evidence to weigh here; we have only the City's evidence defeating summary judgment on the state-of-mind element. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986) (recognizing that even when state of mind is at issue, a nonmoving party must "present affirmative evidence . . . to defeat a properly supported motion for summary judgment").

Next, Green Genie tries to distinguish each of the City's four comparators. As to two of them, Green Genie highlights the fact that, following an initial rejection, each later received approval to operate. But the City's reversal was due to revelations that the sensitive site that was the basis for the drug-free zone was no longer in operation, facts materially different than those in Green Genie's case. In other words, the City only changed course once facts were revealed that "reasonably justified" the differential treatment. *See TriHealth*, 430 F.3d at 790 ("[D]isparate treatment of persons is reasonably justified if they are dissimilar in some material respect."). But at the time of the initial review, when the equal protection violation allegedly occurred, the City reviewed all applications in a similar manner. *See Green*, 654 F.3d at 651 (noting the importance of "time frame" when assessing who is similarly situated).

That leaves two other comparators, both of whom Green Genie argues are not similarly situated. But any dissimilarities, for example, that their proposed sites were not near a combined lot with a church and school, like St. Clare of Montefalco's, are immaterial. *See TriHealth*, 430 F.3d at 790. Setting aside the fact that Green Genie's argument would also eliminate Detroit

Roots as a comparator, each comparator is similar in the most critical respect: it was denied approval because its proposed site was closer than 1,000 radial feet to the closest corner of a tax lot containing a site protected by a drug-free zone. *See Loesel*, 692 F.3d at 463 (requiring relevant similarity).

Lastly, Green Genie turns our attention back to Detroit Roots and Mack Wellness. Green Genie asserts that the City's apparent failure to revoke permits awarded to those two applicants allows for the reasonable inference that Green Genie's denial was intentional. That contention suffers from numerous flaws. For one, it does nothing to discount the evidence of other comparators, meaning Green Genie's treatment was not a "stark outlier," the standard it must meet to show it was intentionally treated differently from others similarly situated. *See SECSYS*, 666 F.3d at 689; *see also Olech*, 528 U.S. at 564. Even taking Green Genie's argument on its face, there is a disconnect in timing between the alleged equal protection violation (i.e., the rejection of Green Genie's application) and the City's later learning of the mistakes in Detroit Roots's and Mack Wellness's applications. We fail to see how the City's subsequent decision to not try to put the genie back in the bottle and shut down Detroit Roots and Mack Wellness makes it more likely than not that the City intentionally treated Green Genie differently from all relevant comparators in reviewing initial applications. *See EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 866 (6th Cir. 2012) ("Gaps in time and context may suggest a change in policy rather than differential treatment."). At best, Green Genie's evidence raises the inference that the City was aware that it was favoring Detroit Roots and Mack Wellness at the expense of others. But the "discriminatory purpose" necessary to establish an equal protection violation "implies more than intent as volition or intent as awareness of consequences"; it requires evidence that "the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r v. Feeney*, 442 U.S. 256, 279 (1979) (citation omitted). Whether the City favored Detroit Roots and Mack Wellness by letting them continue to operate, in other words, does not demonstrate a genuine issue of material fact over whether the City intentionally treated Green Genie differently from all comparators. *See TriHealth*, 430 F.3d at 788; *see also Wiley*, 36 F.4th at 667 (requiring "significant probative evidence" to rebut summary judgment once established by the movant).

**III.**

We affirm the judgment of the district court.